UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MATTHEW DUBAY,

        Plaintiff,

v.

        Case Number 06-11016-BC
        Honorable David M. Lawson

LAUREN WELLS, an individual, and
SAGINAW COUNTY PROSECUTING
ATTORNEY'S OFFICE, by and through,
MICHAEL D. THOMAS, prosecutor,

        Defendants,

and

MICHAEL A. COX, Attorney General
of the State of Michigan,

        Intervening-Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS
## TO DISMISS AND AWARDING COSTS AGAINST PLAINTIFF

    Before the Court are motions to dismiss filed by the defendants and intervening defendant in this action initiated by plaintiff Matthew Dubay, who seeks a declaration that Michigan's paternity statutes are unconstitutional. Dubay also asks for an injunction to prevent the defendants from prosecuting a paternity action against him in the Saginaw County, Michigan circuit court. The motions were argued in open court on June 24, 2006.

    According to the pleadings, Dubay commenced a personal relationship with defendant Lauren Wells, dated her, engaged in intimate sexual relations, impregnated her, terminated his relationship, and sued her for bearing his child. If chivalry is not dead, its viability is gravely imperiled by the plaintiff in this case.

But chivalry is not the issue here, nor does it provide a basis upon which to decide the legal and policy issues that Dubay seeks to advance through this litigation. Rather, the plaintiff contends that Michigan's paternity statutes are repugnant to the United States Constitution's Due Process and Equal Protection Clauses because he has no say, he argues, in the decision whether to beget and bear a child. Therefore, he insists, he ought not to be saddled with the financial responsibility of the child's support, and he should receive damages from the private and public defendants who are attempting to exact that toll from him.

The plaintiff's claims have been rejected by every court that has considered similar matters, and with good reason. The plaintiff's suggestion that the support provisions of the Michigan Paternity Act implicates the Equal Protection Clause does not find support in the jurisprudence. First, the Act's provisions apply only if a child is born and essentially do not concern anyone's right to choose to be a parent. Second, the statutory provisions are facially neutral, requiring both parents equally to support the child. Third, the plaintiff argues that enforcing the Act's provisions, without any deviation from the neutral language of those provisions, still can implicate the Equal Protection Clause because of an underlying inequality: the State's recognition that women can choose to be parents and men cannot. This argument in turn is based on the existence of a right supposedly grounded in substantive due process, as the plaintiff acknowledged at oral argument. But the Sixth Circuit has squarely rejected the argument that fairness or reciprocity generates a substantive right to avoid child support on the theory that a woman has the right to bring to term or terminate a pregnancy on her own. Finally, the plaintiff has failed to demonstrate in even the most remote way that state action plays a role in the interference with his choice to reject parenthood. The consequences of sexual intercourse have always included conception, and the State has nothing to

do with this historical truism. Because the plaintiff has failed to state a colorable claim in his amended complaint, the Court will dismiss the complaint against all the defendants. In addition, the Court finds that the plaintiff's claim is frivolous, unreasonable, and without foundation. Therefore, the Court will grant the State's motion for attorney fees under 42 U.S.C. § 1988(b).

I.

The facts, as alleged, are straightforward. According to the amended complaint, the plaintiff and defendant Wells had a child together, despite the plaintiff's express desires to the contrary and Wells's assurances that she was using some method of birth control and otherwise was infertile. The plaintiff claims that Wells then exercised her unilateral right not to abort the child. Sometime in 2005, the child, EGW, was born "much to the dismay, bewilderment and objection of Dubay who was at all times clear with his desires and intentions to Wells." Am. Compl. at ¶ 16.

The plaintiff thereafter had difficulty accepting the financial consequences of his conduct, so the State came to his assistance by bringing a legal action that would result in an established schedule the plaintiff could follow in contributing to the financial support of his daughter. Wells signed a paternity complaint, and the Saginaw County, Michigan prosecutor initiated proceedings pursuant to the Michigan Paternity Act, Mich. Comp. Laws § 722.711 *et seq.*, to force the plaintiff to help support the child and share the costs of the delivery. The plaintiff sought a stay of proceedings in the Saginaw County circuit court so that this Court could address the plaintiff's claimed constitutional violations arising from Michigan's Paternity Act and its enforcement by the County prosecutor. The state trial court, however, denied the stay.

The complaint in this case was filed on March 9, 2006, and it was amended on March 29, 2006 before a responsive pleading was filed. The plaintiff summarized his claims and the relief requested as follows:

> Specifically, besides other relief, Dubay is seeking a ruling finding that such practices and procedures, as initiated by these Defendants and which touch and detriment [*sic*] thousands of Michigan male residents each year, run afoul of the Equal Protection Clause of the United States Constitution and must be deemed illegal as a matter of law.

Am. Compl. at ¶ 18.

The single count of the amended complaint alleges violations of the Equal Protection Clause of the United States Constitution and Article 1, section 2 of the Michigan constitution. Although Dubay offers several polemical statements in his amended pleading, the gravamen of his claim can be summarized in these allegations:

> 22. Under our nation's evolving jurisprudence, the right to privacy as protected under the concept of personal liberty has never been confined solely to females, as this right is supposed to extend to both men and women in deciding whether to bear or beget a child.
>
> 23. This fundamental right protected by the United States Constitution entails two separate rights that should not, and cannot, be segregated or selectively enforced by parties such as these Defendants. Specifically, it includes the right to procreate as well as the right to avoid procreation by men and women alike. As applied to the instant set of circumstances, the practice and pursuits of each of these Defendants under the guise of state law through Michigan's selectively enforced Paternity Act, which are perpetrated upon similarly situated men throughout this state, are discriminatory in nature and do deny individuals such as, and including, Dubay from [*sic*] the Equal Protection of the law under both federal and state Constitutions and guarantees.
> . . .
>
> 26. Michigan's Paternity Act as enforced, as demonstrated and exhibited by the actions of these Defendants, is an unequivocal violation of equal protection. Such practices and procedures impose special, broad and dissimilar responsibilities and obligations upon men such as Dubay, while affording certain privileges, rights and choices to be unilaterally made and exercised by females such as Wells, all to the

> societal, financial, emotional, psychological and other detriment of Dubay and other similarly situated men.

Am. Compl. at ¶¶ 22-26.

The plaintiff alleges that as a result of the unlawful enforcement of the Paternity Act, he has "[e]ndur[ed] a loss of liberty and . . . dignity; [s]ustain[ed] a loss of public esteem; has [s]ubject[ed] himself to embarrassment, public ridicule, anger, loss of self esteem, etc.; [i]ncurred substantial expense in being forced not only to pursue and seek the protection of his rights, but also to defend himself from the legal process and actions of these Defendants; and [sustained] [o]ther such damages as may become known throughout the course of discovery in this matter." Am. Compl at ¶ 30. The plaintiff asks this Court to declare that the defendants' actions and practices violate the Equal Protection Clause, declare the Michigan Paternity Act unconstitutional as applied to him, enjoin enforcement of the Act against him and all other men similarly situated, and award him monetary damages, attorney fees, and other appropriate equitable relief.

On May 19, 2006, the State of Michigan intervened through its attorney general because the constitutionality of the state paternity statute was at issue. In lieu of filing an answer, the State filed a motion to dismiss. On April 26, 2006, the Saginaw County prosecutor likewise filed a motion to dismiss.

II.

Motions to dismiss are governed by Rule 12(b) of the Federal Rules of Civil Procedure and allow for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). When deciding a motion under that Rule, "[t]he court

must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (1984)). *See also Ana Leon T. v. Fed. Reserve Bank*, 823 F.2d 928, 930 (6th Cir. 1987) (per curiam) (mere conclusions are not afforded liberal Rule 12(b)(6) review).

A.

The Saginaw County prosecutor's motion to dismiss focuses primarily on the theories of Eleventh Amendment and prosecutorial immunity. States generally are immune from damage suits under the Eleventh Amendment. *Ernst v. Rising,* 427 F.3d 351, 358 (6th Cir. 2005) (reasoning that "[f]rom birth, the States and the Federal Government have possessed certain immunities from suit in state and federal courts. . . . For the States, that immunity flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution"). A state's immunity from suits in federal court applies equally when its own citizens bring an action as when citizens of other states do so. *Ibid.* A state official sued in his official capacity likewise is immune. *Ibid.* In addition, when a county prosecutor acts in his or her official capacity as a state agent

enforcing state laws on behalf of the State, Eleventh Amendment immunity extends to that county office as well. *See Pusey v. City of Youngstown*, 11 F.3d 652, 657-58 (1993).

However, "[t]he immunity does not apply if the lawsuit is filed against a state official for purely injunctive relief enjoining the official from violating federal law." *Ernst,* 427 F.3d at 358. In this case, the plaintiff responded to the Saginaw County prosecutor's motion with a disavowal of his intention to seek damages against that defendant. At oral argument on the motion, plaintiff's counsel confirmed that, despite the statements in the amendment complaint, he sought no relief in the form of damages from the public defendants. In their reply, the public defendants adopted the position of the intervening defendant as to the merits of the claim. However, to the extent those defendants' motion is based on the defense of immunity, it will be denied as moot.

B.

The State contends that the plaintiff has failed to plead a cognizable claim in his amended complaint because he has not alleged any recognized constitutional right he enjoys that the State has violated by its enforcement of the Michigan Paternity Act. According to the State, the amended complaint does not allege that an agent of the State interfered with Dubay's decision to engage in activity that predictably would lead to conception, nor does Dubay have a constitutional right to refuse to support his offspring once the child is born.

Dubay responds with an assertion that the right to privacy incorporated in the Constitution encompasses the right to make decisions regarding conception, child bearing, and child rearing. He says that in *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court declared that the State may not interfere with the personal choice to terminate a pregnancy before viability, but since that right belongs only to females, the State's enforcement of paternity statutes amounts to a violation of the

Equal Protection Clause. He insists that applying the Michigan Paternity Act to him and other males somehow trenches upon his right to choose to become a father, and that the Constitution protects his right to decide when he is ready to accept such responsibilities.

Dubay is correct in one aspect of his argument concerning the limitations the Constitution places on the State to interfere with the personal life choices of citizens. Today, there can be no doubt that although "[t]he Constitution does not mention any right of privacy, the [Supreme] Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Carey v. Population Servs., Int'l*, 431 U.S. 678, 684 (1977) (quoting *Roe*, 410 U.S. 113, 152). At its most fundamental level, the right of personal privacy protects "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). Even before *Roe v. Wade*, the Court had held that the Constitution guaranteed that individuals would be free to make decisions without unjustified governmental intrusion "relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12 (1967); procreation, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541-542 (1942); contraception, *Eisenstadt v.Baird*, 405 U.S. [438,] 453-454 [(1971)]; family relationships, *Prince v. Massachusetts*, 321 U.S. 158 (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); . . . *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974)." *Carey*, 431 U.S. at 685.

> The Supreme Court has described the choice to "beget or bear a child" as
>
> at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives, *Griswold v. Connecticut*, *supra*, and most prominently vindicated in recent years in the contexts of contraception, *Griswold v. Connecticut, supra; Eisenstadt v. Baird, supra*; and abortion, *Roe v. Wade, supra*; *Doe v. Bolton*,

-8-

>410 U.S. 179 (1973); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976).

*Ibid.* In *Eisenstadt*, the Supreme Court reiterated: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453; *see also Stanley v. Illinois*, 405 U.S. 645, 651 (stating that "[t]he private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection").

The remainder of Dubay's argument, however, misapprehends the nature of the right to privacy upon which he relies, the absence of the State in any decision about which Dubay seeks protection, and the right of the State to enforce the obligations of those who otherwise would refuse to accept responsibility for the consequences of decisions once made. He apparently accepts the fact that the law gives a biological father no say in a woman's decision to terminate a pregnancy or carry the child to term. *See Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 69-70 (1976). The Sixth Circuit has squarely rejected the notion that some sense of fairness ought to allow biological fathers to avoid the financial responsibility of supporting a child as a proxy for the loss of control of the events that naturally follow from sexual intercourse. *N.E. v. Hedges*, 391 F.3d 832 (6th Cir. 2004).

The fundamental flaw in Dubay's claim is that he fails to see that the State played no role in the conception or birth of the child in this case, or in the decisions that resulted in the birth of the child. Dubay brings his claim under 42 U.S.C. § 1983, which necessarily requires proof of (1) state action; (2) a deprivation of a right secured by the Constitution; and (3) a causal connection between the two. *Wagner v. Metro. Nashville Airport*, 772 F.2d 227, 229 (6th Cir. 1985). State action has

been described as rights-depriving conduct that "is fairly attributable to the State." *Ibid.* But the only state action Dubay identifies is the enforcement of the paternity statutes, which by their own, plain terms apply only *after* the child is born. *See* Mich. Comp. Laws § 722.712 (stating that "[t]he parents of a child *born out of wedlock* are liable for the necessary support and education of the child," which a court may apportion "based on each parent's ability to pay and on any other relevant factor") (emphasis added). Section 712 can only be applied *if* a child is born. The term "child" is specifically defined to require birth. *See* Mich. Comp. Laws § 722.711 (defining child to mean "a child *born* out of wedlock) (emphasis added). The State did not participate in, regulate, or affect the decision to bear the child. The court of appeals in *Hedges* affirmed the district court's rejection of a similar argument due to the absence of state action, summarized as follows:

> Plaintiff has identified no action taken by a state actor that impacted in any way his choice to father a child. As he complains of actions taken under the Commonwealth's statutes that permit the establishment of paternity and the imposition and enforcement of child support obligations, the Court sees no evidence that the state required him to engage in the sexual activity that resulted in the conception of his son. Further he has identified no action taken by a state actor that interfered in any way with his choice to use or not to use contraceptive methods – or additional contraceptive methods, as the case may be – during sexual activity to avoid his sexual partner's resulting pregnancy. Accordingly, he cannot state a claim for a violation of his substantive rights under the Fourteenth Amendment by the application of the laws of Kentucky for establishing paternity and imposing and enforcing child support obligations.

*Hedges*, 391 F.3d at 834. As the State has pointed out, the Hawaii Supreme Court rejected the argument in more succinct language: "the father elected a course of conduct inconsistent with the exercise of his right not to beget a child. The reproductive consequences of his actions were imposed by the operation of nature, not statute." *Child Support Enforcement Agency v. Doe*, 125 P.3d 461, 469 (Haw. 2005).

The right to privacy described by the Supreme Court's cases prevents the State from inserting itself into the process of decision-making by sexual partners concerning the matters of conception and birth. Those decisions, and the disagreement of the two parties over those decisions, are private matters. The Fourteenth Amendment gives no succor to a disgruntled sexual partner who fails to reach accord over these important matters, nor even to one who is misled by the actions of a private party. It is well settled that the State does not have an affirmative duty to correct underlying inequality in society. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989) (stating that the Fourteenth Amendment "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text"); *see also Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005).

The plaintiff contends that the State's "failure" to somehow equalize the apparent disparity in the control over the abortion decision violates the Equal Protection Clause. He acknowledges that the "right" he believes is unequally applied to males finds its support in the concept of substantive due process. However, the Supreme Court's cases do not create a state-enforced right to an abortion; rather, they describe a constitutional right to privacy (which is not absolute) that protects against unwarranted *interference* by the State into matters of personal decision-making, which include the decision to abort or continue a pregnancy. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992) (observing that "*Roe*'s essential holding" includes "a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State," and "the State's power to restrict abortions after fetal

viability, if the law contains exceptions for pregnancies which endanger the woman's life or health"). The State does not enforce the right to privacy; rather, it is the right to privacy that protects individuals from the State. Since the State does not "enforce" the right to privacy, it cannot do so unequally. Moreover, the Sixth Circuit has unequivocally rejected the notion that a right to disavow parenthood arises for males as a counter-balance to the recognition that the constitutional privacy protections concerning reproductive choices naturally impact women more than men:

> Plaintiff makes a kind of "fairness" or "reciprocity" argument. . . . The plaintiff argues that the Kentucky paternity and child support laws are inconsistent with sexual and procreative "privacy" rights recognized by the Supreme Court. . . . The right to procreative privacy, he argues, "includes the right to decide not to become a parent even after conception," and "must extend to both biological parents," so that "Kentucky's statutory scheme" must be invalidated because it "imposes parenthood on biological fathers while denying them any right or opportunity to decide not to become a parent after conception."
> 
> . . .
> 
> As the plaintiff concedes, there are no judicial decisions recognizing a constitutional right of a man to terminate his duties of support under state law for a child that he has fathered, no matter how removed he may be emotionally from the child. Child support has long been a tax fathers have had to pay in Western civilization. For reasons of child welfare and social utility, if not for moral reasons, the biological relationship between a father and his offspring – even if unwanted and unacknowledged – remains constitutionally sufficient to support paternity tests and child support requirements. We do not have a system of government like ancient Sparta where male children are taken over early in their lives by the state for military service. The biological parents remain responsible for their welfare. One of the ways the state enforces this duty is through paternity laws. This responsibility is not growing weaker in our body politic, as plaintiff seems to suggest, but stronger as the passage of the Child Support Recovery Act of 1992, Pub.L. No. 102-521, the Deadbeat Parents Punishment Act of 1998, Pub.L. No. 105-187, and the Child Support Performance and Incentive Act of 1998, Pub.L. No. 105-200, would indicate. The sexual privacy cases referred to by plaintiff do not give either biological parent the right to escape responsibility after the child is born. Neither the laws of biological reproduction nor the Due Process Clause recognize the "fairness" arguments plaintiff raises. Reproduction and child support requirements occur without regard to the male's wishes or his emotional attachment to his offspring.

*Hedges*, 391 F.3d at 834-35.

The Michigan Paternity Act does not violate the Equal Protection Clause either on its face or as applied to plaintiff Dubay in this case. The Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 2. The Supreme Court has described the protection afforded by the Equal Protection Clause as "'essentially a direction that all persons similarly situated should be treated alike.'" *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). As a general rule, laws enacted by state legislatures enjoy a presumption of validity. *Id.* at 440. Courts reviewing those laws will uphold them as long as "the classification drawn by the statute is rationally related to a legitimate state interest." *Ibid.* When the State legislates in the areas of economic and social policy, the Fourteenth Amendment affords the State "wide latitude." *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174 (1980). This broad discretion exists because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440.

The presumption of validity may disappear when a statute makes classifications based on gender or sex. Those factors "generally provide[] no sensible ground for differential treatment. '[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability . . . is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.'" *Id.* at 440-41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion)). In short, "[r]ather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *Id.* at 441. When a statute makes such classifications, "[t]he State must show at least that the challenged classification serves important governmental objectives and

that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 531 (1996).

However, "[c]ourts have never found that legal classifications based on this biological relationship of fathers and their children were subject to a high level of scrutiny. *See Parham v. Hughes*, 441 U.S. 347, 355-57 (1979) (upholding wrongful death statute granting cause of action only to unwed mothers, not unwed fathers, and imposing low level of scrutiny); *Rivera v. Minnich*, 483 U.S. 574, 580 (1987) ('putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law'); *Developments in the Law-The Constitution and the Family*, 93 Harv. L. Rev. 1156, 1270-83 (1980)." *Hedges*, 391 F.3d at 835. Therefore, biological classifications such as these are upheld if rationally related to a legitimate state interest.

The plaintiff does not cite specific portions of Michigan's Paternity Act that he believes violate the Fourteenth Amendment either on their face or as applied to him. However, the liability of parents to children born out of wedlock is set forth in Michigan Compiled Laws § 722.712(1), the core provision of the Paternity Act, which states:

> The parents of a child born out of wedlock are liable for the necessary support and education of the child. They are also liable for the child's funeral expenses. Subject to subsections (2) and (3), based on each parent's ability to pay and on any other relevant factor, the court may apportion, in the same manner as medical expenses of the child are divided under the child support formula, the reasonable and necessary expenses of the mother's confinement and expenses in connection with her pregnancy between the parents and require the parent who did not pay the expense to pay his or her share of the expense to the other parent. At the request of a person other than a parent who has paid the expenses of the mother's confinement or expenses in connection with her pregnancy, the court may order a parent against whom the request is made to pay to the person other than a parent the parent's share of the expenses.

This provision makes no classification based on gender, sex, or biology. It simply commands that "[t]he parents of a child born out of wedlock are liable for the necessary support and education of the child." There is no equal protection violation found in the plain terms of the statutory text. (The plaintiff makes a similar argument with respect to the "safe haven" legislation that allows "a parent [to] surrender[] a child who may be a newborn to an emergency service provider," thereby effectuating a placement for adoption, and grants both parents the right to petition for custody within twenty-eight days. Mich. Comp. Laws §712.3. This statute likewise is gender-neutral on its face.)

The plaintiff maintains, however, that the statute is unequally applied because it "forc[es] him into involuntary parenthood against his interests and contrary to the decisions he made to not be a parent." Pl.'s Br. in Opp. to Intervening Def.'s Mot. to Dismiss at 7. In this assertion the plaintiff is mistaken. A judgment of filiation under the Paternity Act itself does not make Dubay a father; it merely confirms a biological fact – that the man has sired the child – upon presentation of proper proof. There are, to be sure, financial consequences that flow from that determination; but the State has a compelling interest in ensuring the support of children. Over 200 years ago, the idea that biological ties create legal obligations was articulately set out by William Blackstone in his *Commentaries*:

> The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world; for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children have the perfect *right* of receiving maintenance from their parents.

1 William Blackstone, *Commentaries* at 447. This interest overrides any claim that the plaintiff should be permitted to opt out of his support obligation.

The plaintiff also argues that the concept of parenthood encompasses more than an obligation to financially support a child, and he ought not be forced into the role of "father" before he is ready and chooses it for himself. Indeed, there are enormous moral obligations and duties placed upon parents.

> The judgment that a defendant is the father of a particular child is the pronouncement of more than mere financial responsibility. It is also a declaration that a defendant assumes a cultural role with distinct moral expectations. Most of us see parenthood as a lifelong status whose responsibilities flow from a wellspring far more profound than legal decree. Some men may find no emotional resonance in fatherhood. Many, however, will come to see themselves far differently, and will necessarily expand the boundaries of their moral sensibility to encompass the child that has been found to be their own. The establishment of a parental relationship may at the outset have fewer emotional consequences than the termination of one. It has, however, the potential to set in motion a process of engagement that is powerful and cumulative, and whose duration spans a lifetime.

*Rivera v. Minnich*, 483 U.S. 574, 584-85 (1987) (Brennan, J., dissenting). Whether the plaintiff finds "emotional resonance" in his circumstance, or discards the opportunity as do many defendants in "the typical contested paternity proceeding," is entirely up to him. *See id.* at 580 (holding that proof of paternity by a preponderance of evidence satisfies due process, and that "[i]n the typical contested paternity proceeding, the defendant's nonadmission of paternity represents a disavowal of any interest in providing the training, nurture, and loving protection that are at the heart of the parental relationship protected by the Constitution"). The State's judgment of filiation carries with it no mandate that the plaintiff accept the mantle of parenthood in the fullest sense of the term. He still retains that choice.

Finally, in his brief and at oral argument, the plaintiff suggested that the public defendant may engage in selective enforcement of the Paternity Act on the basis of sex. "It is axiomatic that the Equal Protection Clause protects citizens from [arbitrary] [state] action" including the selective

enforcement of laws based on discriminatory animus. *Bennett v. City of Eastpointe,* 410 F.3d 810, 818 (6th Cir. 2005) (citing *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). The Sixth Circuit has explained that in order to make out a case of selective enforcement, the plaintiff "must establish that the challenged [enforcement action] 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Ibid.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). However, the plaintiff has not alleged that the Saginaw County prosecutor has ever been asked (and then refused) to enforce the Paternity Act's support provisions against a female or that a male, including the plaintiff, has been denied the benefits or protections of the Act.

The Court finds that the plaintiff has not set forth a claim in his amended complaint for which relief may be granted. No conceivable set of facts would entitle the plaintiff to the relief he seeks. The motions to dismiss, therefore, will be granted.

C.

The intervening defendant also moves for attorney fees pursuant to 42 U.S.C. § 1988. That statute provides:

> In any action or proceeding to enforce a provision of section[] . . . 1983 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b). The cases plainly state that "a prevailing *defendant* should only recover [attorney fees under section 1988] upon a finding by the district court that 'the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" *Wayne v. Vill. of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994) (quoting *Hughes v. Rowe*, 449 U.S. 5, 14 (1980); *see also Tech. Recycling Corp. v. City of Taylor*, __ F.3d __, __, 2006 WL 1792413, *12-*14 (6th Cir. June 28, 2006).

Although Dubay couches his claim in the language of the Equal Protection Clause, the theory of the plaintiff in this case has its roots in a concept of substantive due process that has been soundly rejected by other courts, including the Sixth Circuit over two years before Dubay filed his lawsuit. *See Hedges*, 391 F.3d at 836. After affirming the dismissal of the claim, the *Hedges* court took the additional step of affirming an award of attorney fees against the plaintiff in that case. The court there proclaimed:

> The plaintiff presents simply a novel legal theory, a theory that would invalidate the paternity and child support laws of the fifty states and the federal acts on child support. The theory is that unwed fathers, as a matter of reciprocity, should also be given the choice to deny any financial responsibility for the child's existence. It is a theory so foreign to our legal tradition that it has no "foundation," no chance of success. We cannot imagine that any federal court would agree with plaintiff's principle that the concept of "procreative privacy" should be stretched to include the constitutional right for a father to receive the constitutional equivalent of the termination of the mother's pregnancy by allowing him the right to deny paternity and deny the duty of financial support.

*Hedges*, 391 F.3d at 836.

This Court likewise finds that the amended complaint in this case is frivolous, unreasonable, and without foundation and seeks to advance a theory that is foreign to the legal principles on which it is ostensibly based. The message that such a claim not only is without foundation but would subject its proponent to the costs of defending against it was sent by the *Hedges* court, to be ignored by a putative plaintiff at his peril.

The intervening defendant may submit documentation to support its request for attorney fees in accordance with Federal Rule of Civil Procedure 54(d)(2) and section 1988. *See Mehney-Egan v. Mendoza*, 130 F. Supp. 2d 884 (E.D. Mich. 2001).

III.

The Court finds that the public defendants' motion based on Eleventh Amendment and prosecutorial immunity should be dismissed as moot, but their motion based on grounds asserted by the intervening defendant is meritorious. The Court determines that the plaintiff has failed to set forth a claim for which relief can be granted. The Court also determines that the plaintiff's claim is frivolous, unreasonable, and without foundation, and therefore the intervening defendant is entitled to attorney fees.

Accordingly, it is **ORDERED** that the motions to dismiss by the public defendants and the intervening defendant [dkt # 6, 7] are **GRANTED**, and the case is **DISMISSED** in its entirety **WITH PREJUDICE**.

It is further **ORDERED** that the intervening defendant's motion for attorney fees is **GRANTED**, provided that the intervening defendant submits proper documentation in support of its fee request within the time allowed by Federal Rule of Civil Procedure 54(d)(2).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 17, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 17, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---